UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA KADDO,

          Plaintiff,                  Case No. 4:15-cv-10647
                                        District Judge Terrence Berg
v.                                   Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

## REPORT AND RECOMMENDATION TO GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 17) AND TO DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 19)

## I.    RECOMMENDATION

For the reasons that follow, it is **RECOMMENDED** that the Court

**GRANT** Plaintiff's motion for summary judgment (DE 17), **DENY** Defendant's

motion for summary judgment (DE 19), and **REVERSE AND REMAND** the

Commissioner's decision.

## II.    REPORT

Plaintiff, Linda Kaddo, brings this action under 42 U.S.C. § 405(g) for

review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for social security disability insurance

benefits.  This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 17), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 19), and the administrative record (DE 11).

### A.   Background

Plaintiff filed her application for disability insurance benefits on March 16, 2009, alleging that she had been disabled since December 26, 2006.  (R. at 274-280.)  Plaintiff later amended her disability onset date to October 7, 2005.  (R. at 93.)  Plaintiff's application was denied (R. at 165-168) and she sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  (R. at 169-170.)  ALJ Jeanne VanderHeide held a hearing on January 5, 2011.  (R. at 86-138.)  On March 22, 2011, the ALJ issued an opinion which found Plaintiff to not be disabled.  (R. at 141-154.)

In response to Plaintiff's request, in August 2012 the Appeals Council vacated and remanded the ALJ's decision.  (R. at 158-161.)  Specifically, among other things, the Appeals Council directed the ALJ to:

- Obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's mental impairments

- Further evaluate Plaintiff's mental impairments

- Further evaluate Plaintiff's residual functional capacity (RFC)[1] by evaluating treating and non-treating source opinions and non-examining source opinions and to explain the weight given to such evidence.

(R. at 160-161.)

On remand, the case was again assigned to ALJ VanderHeide, who held another hearing on March 27, 2013.  (R. at 38-85.)  On May 11, 2013, the ALJ issued a decision which again found Plaintiff to not be disabled.  (R. at 16-33.)  On December 24, 2014, the Appeals Council denied Plaintiff's request for review.  (R. at 1-3.)  The ALJ's decision thus became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

### B.    Plaintiff's Medical History

Initially, Plaintiff asserted she was disabled due to neck and back problems stemming from two vehicular accidents, a craniotomy[2] which removed a lesion and an unspecified "emotional problem[.]"  (R. at 305.)  However, at the second hearing before the ALJ, Plaintiff's counsel stated that Plaintiff was "abandoning

---

[1] A claimant's "residual functional capacity" is an assessment of the most he or she can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

[2] A craniotomy is defined in relevant part as a "surgical opening of the skull[.]" https://www.merriam-webster.com/dictionary/craniotomy#medicalDictionary (last visited December 16, 2016).

any type of physical basis for disability, and we were [sic] proceeding almost

purely on a psychological basis." (R. at 44.) This Report and Recommendation,

therefore, will focus on Plaintiff's mental condition.

In October 2007, Plaintiff told her treating physician, S.S. Ahmad, M.D.,

that she had been experiencing anxiety attacks. (R. at 459.) Dr. Ahmad prescribed

Xanax for Plaintiff in December 2007. (R. at 456.) Plaintiff ultimately sought

mental health treatment at ACCESS (Arab Community Center for Economic and

Social Services) in April 2009, after her father passed away. (R. at 524.) Aliah

Azmeh, LLMSW, did an initial adult psychosocial assessment of Plaintiff in April

2009 and diagnosed her as having major depressive disorder, single episode and

severe without psychotic features, and panic disorder without agoraphobia. (R. at

528.) Ms. Azmeh assessed a global assessment of functioning ("GAF") score of

50 for Plaintiff.[3] (R. at 528.)

---

[3] As previously explained by this Court:

> The GAF score is a subjective determination that represents "the
> clinician's judgment of the individual's overall level of functioning."
> AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND
> STATISTICAL MANUAL OF MENTAL DISORDERS, (4th
> ed.1994) at 30. It ranges from 100 (superior functioning) to 1
> (persistent danger of severely hurting self or others, persistent
> inability to maintain minimal personal hygiene, or serious suicidal act
> with clear expectation of death). *See id.* at 32. A GAF score of 31–40
> indicates "some impairment in reality testing or communication (e.g.,
> speech is at times illogical, obscure, or irrelevant) or major
> impairment in several areas such as work or school, family relations,
> judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the

Plaintiff saw Ms. Azmeh multiple times in 2009 and 2010 (R. at 644-662), but in May 2009 she also began to see Abdullah Mohammed, M.D., at ACCESS. (R. at 533.)[4] Dr. Mohammed's May 15, 2009 initial psychiatric evaluation of Plaintiff resulted in a diagnosis of, among other things, bipolar disorder, panic disorder and Cluster B traits or borderline personality traits, with a GAF of 45. (R. at 535.) Plaintiff continued to see Dr. Mohammed and/or to be provided prescriptions by him for a couple of years. (R. at 687-692; 614-627.)[5]

Eugene Schimmel, Ph.D., LLP, examined Plaintiff once in June 2009 and once in July 2009. (R. at 537.) In his August 2009 report, Dr. Schimmel stated that Plaintiff "did not exhibit any tendency to exaggerate or minimize symptoms." (R. at 541.) Dr. Schimmel thus concluded that the testing results he obtained were "valid, given her [Plaintiff's] high degree of motivation . . . ." (R. at 543.) Dr.

---

patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id. Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n.1 (E.D. Mich. 2005). However, "the most recent version of the DSM does not include a GAF rating for assessment of mental disorders." *Bryce v. Comm'r of Soc. Sec.*, 2014 WL 1328277, at *10 (E.D. Mich. Mar. 28, 2014).

[4] At times, the record refers to him as Mohammed Abdullah. *See, e.g.,* R. at 690. The Court will refer to him as Dr. Mohammed, in accordance with how he is referred to by the parties.

[5] Dr. Mohammed's handwritten notes are virtually indecipherable. By way of illustration, at the second hearing before the ALJ the medical expert mistakenly thought some notes were written in Farsi, not English. (R. at 82-83.)

Schimmel found Plaintiff to have a verbal IQ of 73, a performance IQ of 70 and a full scale IQ of 69, which meant she was "functioning in the Extremely Low range." (R. at 543.)[6] Dr. Schimmel also noted that Plaintiff's responses to another test "indicate that she experiences distress related to somatic concerns, i.e., physical health issues . . . ." (R. at 545.) Dr. Schimmel concluded that Plaintiff's "psychiatric symptoms interfere significantly with . . . [her] ability to work and caused her to leave her job as a waitress at her family's restaurant in Dearborn in late December 2006." (*Id.*) Finally, Dr. Schimmel diagnosed Plaintiff as having, among other things, cognitive disorder, bipolar disorder and panic disorder, and he assessed her GAF as 45. (R. at 546.)

In September 2010, Ms. Azmeh completed a checklist style mental RFC assessment of Plaintiff. (R. at 663-664.) Ms. Azmeh listed Plaintiff as being moderately limited in some categories, such as carrying out simple instructions and making simple work decisions. (*Id.*). She found Plaintiff was markedly limited in other categories, such as understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; being able to work in proximity to others without being distracted; and being able to

---

[6] Plaintiff's Wide Range Achievement Test (WRAT) scores were "significantly higher than predictions based on the [Plaintiff's] IQ scores" but Dr. Schimmel concluded that disparity was "likely due to the medical problems noted in Dr. Mohammed's report." (R. at 544.)

complete a normal workday without interruptions stemming from her psychologically based symptoms.  (*Id.*)

In November 2010, psychiatrist M. Dibai, M.D., performed a consultative psychiatric evaluation of Plaintiff.  (R. at 665-667.)  Dr. Dibai noted that Plaintiff "appeared preoccupied with somatic complaints[,]" particularly back pain.  (R. at 666.)  Plaintiff also appeared to be visibly agitated, depressed and irritable.  (*Id.*)  Dr. Dibai diagnosed Plaintiff as having chronic major depression and dependent personality trait.  (R. at 667.)  He ruled out Plaintiff as having bipolar disorder.  (*Id.*)[7]  Dr. Dibai assessed Plaintiff's GAF as 32.[8]

In January 2011, after the first hearing but before the ALJ issued her first opinion, Plaintiff had a consultative examination performed by Nick Boneff, Ph.D., LP.  (R. at 669-673.)  Dr. Boneff described Plaintiff as appearing "to exaggerate her difficulties throughout the evaluation, presenting in an immature fashion and acting in a histrionic manner."  (R. at 670.)  Testing showed Plaintiff had a verbal IQ score of 68, a performance IQ score of 59 and a full scale IQ score of 62, which Dr. Dibai stated placed Plaintiff in the "mildly retarded range . . . ." (R. at 672.)

---

[7] Dr. Dibai's report actually states "R/O Bipolar Disorder, mixed type."  (R. at 667.)  Presumably, "R/O" means "rule out."

[8] Dr. Dibai did not use the term GAF; instead he listed 32 as Plaintiff's Axis V diagnosis.  However, Axis V correlates to GAF.  *See, e.g.,* http://www.clevelandclinicmeded.com/medicalpubs/diseasemanagement/psychiatry-psychology/behavioral-assessment-of-medical-patient/ (last visited December 15, 2016).

Because of the "unexplained drop" in Plaintiff's testing scores compared to tests performed by Dr. Schimmel, Dr. Dibai concluded that he could not "determine today's results to reflect a valid and accurate measure of her current functioning." (R. at 672.)  Dr. Dibai also commented that Plaintiff "also obviously would seem to be extremely motivated, on some level[,] to perform on a low level to try to qualify for Social Security benefits . . . ."  (R. at 672.)  Dr. Dibai diagnosed Plaintiff as having adjustment disorder with mixed emotional features and mixed personality disorder with histrionic, borderline, narcissistic and dependent features. (*Id.*)  He assessed Plaintiff's Axis V (GAF) score as 50.  (*Id.*)

## C.    Administrative Proceedings

### 1.  Pre-remand Proceedings

#### a.  Plaintiff's Hearing Testimony

At the January 2011 hearing, Plaintiff testified that she was twenty-nine years old and lived with her three children and her mother, who, along with other family members, helped Plaintiff take care of her children.  (R. at 93-94, 122-124.) Plaintiff had earned about 110 credit hours from Henry Ford Community College with a 3.2 g.p.a., but she testified that she had "started doing bad[ly]" in school the last year or so.  (R. at 95-96.)  Plaintiff formerly worked as a waitress/manager in her family's restaurant.  (R. at 97-98.)

Plaintiff described herself as having depression, headaches and pain in her left side from her neck to her back.  (R. at 99-100.)  According to Plaintiff, anxiety causes her to attack her face and she sometimes went days without sleeping, but barely got out of bed other days.  (R. at 103.)  When asked what she did during the day, Plaintiff stated "[r]eally nothing.  I don't do much."  (R. at 105.)  Plaintiff stated she could: sit for an hour; stand for half an hour; and walk five minutes before becoming anxious.  (R. at 106-107.)  Plaintiff used her laptop computer to occasionally shop and socialize via Facebook, though she did not go out to socialize with others.  (R. at 109-110.)

Plaintiff was then enrolled in two college courses, one of which was a chemistry class she had once dropped and once received a D. (R. at 111.)   Plaintiff sometimes felt too depressed to attend class (R. at 112), and when asked by her attorney, Plaintiff testified that she did not show up for about thirty percent of her classes.  (R. at 113.)  Similarly, Plaintiff testified that when she was employed at her family's restaurant, she called in and failed to go to work about ten days per month.  (R. at 114-115.)  Plaintiff testified that the treatment she received from Ms. Azmeh and Dr. Mohammed at ACCESS was "[n]ot at all" helpful.  (R. at 119.)  Plaintiff sometimes failed to eat for days and other times went on eating binges, which caused her weight to fluctuate.  (R. at 124-126.)

### b. Vocational Expert's Hearing Testimony

Diane Doyle Regan also testified as a vocational expert ("VE"). (R. at 130-136.) The VE testified that Plaintiff's prior work as a restaurant manager was classified as skilled and light (performed at the medium level) and her prior work as a waitress was classified as unskilled and light. (R. at 132.) The VE answered simply "[n]o" to the following lengthy question from the ALJ:

> Assuming a person of claimant's age, education, work experience and skillset who is able to perform light work as defined by the regulations, with the additional limitation of no constant rotation, flexion, or extension of the neck, and work is limited to simple, routine, and repetitive tasks. Work is also limited to a low stress job, defined as only occasionally having decision making required, and only occasional changes in the work setting, only occasional judgment required on the job, and where there is no production, rate, or pace work. Would such an individual be able to perform any of claimant's past work?

(R. at 133.) When asked if there were other jobs such a hypothetical person could perform, the VE replied that such a person could work as a packer (6,000 jobs in Southeast Michigan), a sorter (4,000 jobs) and as an office helper (15,000 jobs). (R. at 133-134.) Adding a sit/stand option, according to the VE, would not affect the office helper position but would reduce by half the number of packer and sorter positions. (R. at 134.)

### c. ALJ's Decision

In her March 22, 2011 decision, the ALJ found that Plaintiff remained insured through December 31, 2011. (R. at 146.) At Step 1 of the sequential

evaluation process,[9] the ALJ found Plaintiff had not engaged in substantial gainful activity since December 26, 2006.  (*Id.*)  At Step 2, the ALJ found the following severe impairments:  "neck and back disorders, 2005 parietal craniotomy, depression, panic disorder, attention deficit disorder, and bipolar disorder . . . ."  (*Id.*)  At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 147-148.)

---

[9] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Prior to undertaking Step 4, the ALJ evaluated Plaintiff's RFC and determined that she had the capacity to perform light work[10] with some limitations, such as sundry exertional limitations and requirements that the work be simple, routine, low stress and the like.  (R. at 148-152.)  As part of that determination, the ALJ gave "little weight" to Dr. Schimmel's opinion because he "is a non-treating source, and he assumes facts which are not supported by the record." (R. at 151.)  The ALJ also gave "little weight" to the opinion of Dr. Dibai because he only saw Plaintiff once and his conclusions were "based primarily upon the claimant's representations."  (*Id.*)  Though the ALJ did not expressly assign the weight she gave to Dr. Boneff's opinion, she seemed to largely reject it, opining that his findings were "not in line with someone who continues to be enrolled in college courses and maintaining [sic] a 3.2 grade point average."  (R. at 151-152.)  The ALJ gave "some weight" to Ms. Azmeh's opinions (R. at 152) but gave "significant weight" to the findings of Blaine Pinaire, Ph.D., a state agency consultative examiner, who had opined that Plaintiff was capable of unskilled tasks and had only moderate limitations regarding understanding, memory, sustained

---

[10] In relevant part, light work is defined as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §404.1567(b).

concentration, persistence of effort, socialization or adaptation.  (*See* R. at 565.)[11]

At Step 4, the ALJ found that Plaintiff could not perform her past relevant work.

(R. at 152.)  Finally, at Step 5 the ALJ found that Plaintiff could perform other

jobs, such as packer, sorter and office helper.  (R. at 153.)  Consequently, the ALJ

concluded that Plaintiff was not disabled.  (R. at 153-154.)

### d.  Appeals Council's Order

In its August 31, 2012 order, the Appeals Council specified several actions

the ALJ needed to take on remand.  (R. at 159-161.)  Of particular relevance, the

Appeals Council directed the ALJ to "obtain evidence from a medical expert to

clarify the nature and severity of the claimant's mental impairments" and to "[g]ive

further consideration to the claimant's maximum residual functional capacity . . . .

In so doing, evaluate treating and non-treating source opinions . . . and non-

examining source opinions . . . and explain the weight given to such opinion

evidence."  (R. at 160-161.)

### 2.  Post-remand Proceedings

### a.  Plaintiff's Testimony

---

[11] The ALJ did not specifically refer to Dr. Pinaire but instead referred only to an unnamed "State Agency psychological consultant" whose report was found at Exhibit 7F.  (R. at 151.)

At the March 27, 2013 hearing, Plaintiff was thirty-two years old and she and her three children lived with her brother and sister-in-law.  (R. at 47.)  Plaintiff is "starting to not be able to concentrate" and her cumulative grade point average has dropped to 2.33.  (R. at 49-50.)  When asked if anything had changed since the previous hearing, Plaintiff responded that she is "getting worse" and has "mood swings, short tolerance" and a worsening ability to remember.  (R. at 53.)

Plaintiff still takes various prescription medications, including Adderall, Xanax and Zoloft, which cause her to become nauseated and fatigued.  (R. at 54-55.)  According to Plaintiff, she sometimes takes her children to school and her daughter to dance class, but she does not perform any household chores.  (R. at 55-57.)  Plaintiff is not in school and does not socialize with anyone outside her family.  (R. at 57-58.)  Plaintiff had to sell her home because she cannot work.  (R. at 58-59.)  Plaintiff does not want to see anyone or do anything because she is too depressed.  (R. at 60.)  Her anxiety interferes with her ability to drive a car and she gets lost easily.  (R. at 61.)  Plaintiff stopped seeing Ms. Azmeh because "every time I go talk to her, you know, she'll ask me about my issues, and it made me feel worse every time I have to talk about them."  (R. at 63.)  Plaintiff separated from her husband and had a boyfriend for a time, but that relationship ended.  (R. at 68-69.)

### b.  Medical Expert's Testimony

Martin Macklin, M.D., testified as a medical expert ("ME").  The ME testified that he had not examined or treated Plaintiff, but he had reviewed the record.  (R. at 70, 74-75.)  When asked which impairments of Plaintiff's were established by medically acceptable clinical and laboratory findings, the ME mentioned depression, anxiety (which he testified was sometimes diagnosed in the record as panic disorder), and "either organic mental disorder or mental retardation . . . ."  (R. at 75.)  The ME also stated "there's also some elements of somatoform disorder, and counsel mentioned histrionic.  We're not supposed to use that term anymore, so—it's a sexist term, so we don't use histrionic anymore . . . . [W]e use somatoform disorder now, or something similar to that."  (R. at 76.)[12]  The ME described the combination of those impairments, along with ADHD, as being severe.  (R. at 76-77.)  In fact, the ME believed the combination of Plaintiff's impairments equaled Listing 12.07, which pertains to somatoform disorder.[13]

---

[12] Somatoform disorder is defined as "any of a group of psychological disorders (as body dysmorphic disorder or hypochondriasis) marked by physical complaints for which no organic or physiological explanation is found and for which there is a strong likelihood that psychological factors are involved[.]"  https://www.merriam-webster.com/medical/somatoform%20disorder (last visited December 15, 2016).

[13] Listing 12.07 is as follows:
> Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented by evidence of one of the following:

1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

2. Persistent nonorganic disturbance of one of the following:

a. Vision; or

b. Speech; or

c. Hearing; or

d. Use of a limb; or

e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or

f. Sensation (e.g., diminished or heightened).

3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

When asked, the ME testified his conclusion is based on Plaintiff's conditions in combination equaling Listing 12.07. (R. at 81.) The ME stated that Plaintiff has marked difficulties in social functioning and in maintaining concentration, persistence and pace, despite her having successfully taken college courses. (R. at 82.) The ME's testimony concluded with the following exchange:

> Q. [by the ALJ] Yeah, and I guess my question is, I mean, honestly, I'm surprised she did—with all that was going on got as far as she did, but, you know, if the—but that's different from saying that an individual would be—not be able to work at a job where it was simple, routine tasks, low-stress environment, occasional decision making, only occasional changes in the work setting, no fast-paced production work, occasional interaction with [the] public and others.
>
> A. [by the ME] It is very different, because she just—she only had to be there [presumably school] for an hour at a time, and didn't show up part of the time. You can't work like that. You can't be employed with those conditions."

(R. at 84.)

### c. ALJ's Decision

In her opinion on remand, the ALJ again found that Plaintiff was insured through December 31, 2011. (R. at 21.) At Step 1, the ALJ found that Plaintiff did not engage in substantial gainful activity from the alleged onset date of October 7, 2005 through her date last insured of December 31, 2011. (R. at 22.)[14] At Step 2,

---

20 C.F.R. Part 404, Subpart P, Appendix 1.

[14] It is unclear why the ALJ concluded in her first decision that Plaintiff engaged in substantial gainful activity in 2006, but concluded in her second decision that Plaintiff had not engaged in substantial gainful activity since October 2005.

the ALJ found Plaintiff to have the following severe impairments:  "neck and back disorder; headaches status/post craniotomy; depression; panic disorder; attention deficit disorder; bipolar disorder; and personality disorder. . . ."  (*Id.*)

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment.  (*Id.*)  The ALJ explained that she did not adopt Dr. Macklin's contrary conclusion because "none of the other psychiatrists or psychologists who examined the claimant diagnosed her with a somatoform disorder."  (R. at 24.)  The ALJ also stated that "many of the elements consistent with somatoform disorder, such as overemphasis of mild symptomology or repeated complaints of unverifiable impairments, are often displayed by claimants who chronically exaggerate the severity of their impairments in order to obtain disability insurance benefits."  (R. at 25.)  Thus, the ALJ believed that "the invalidity of the claimant's IQ evaluations, coupled with her academic transcript, strongly suggests that the claimant is exaggerating the severity and limitations imposed by her mental illness."  (*Id.*)  Accordingly, the ALJ "reject[ed] Dr. Macklin's conclusion that the claimant's mental impairments medically equals §12.07(A)(3) of the listings of impairments, . . . [because] such [a] finding relies heavily upon the subjective complaints of the claimant, and is otherwise substantially inconsistent with the record as a whole."  (*Id.*)

18

Prior to undertaking a Step 4 analysis, the ALJ found that Plaintiff's RFC allowed her to perform light work except she:

> cannot repetitively rotate, flex or extend her neck. The claimant must have a sit/stand option, provided that she is not off task for more than 10% of the workday. The claimant is limited to simple, routine, and repetitive tasks, performed in a low-stress work environment with only occasional decision-making and changes in the work setting, and only occasional interaction with the general public and co-workers.

(*Id.*)  In explaining how she arrived at that RFC assessment, the ALJ stated that, with the exception of Dr. Boneff's report, "there appears to be no dispute regarding the medical evidence reviewed and discussed in the previous decision . . . ."  (R. at 26.)  Therefore, "unless otherwise indicated" the ALJ adopted by reference "the analysis of all evidence contained in the March 22, 2011 decision, as though it were set forth in its entirety."  (R. at 26.)

The ALJ found the IQ scores of Drs. Boneff and Schimmel to be invalid "as they directly contradict approximately 7 years' worth of demonstrated academic achievement on the part of the claimant."  (R. at 27.)  The ALJ also expressly gave "little weight" to Dr. Dibai's assessment because "it was prepared based upon the subjective complaints of the claimant during an initial psychiatric evaluation." (*Id.*)

The ALJ also found it "curious" that Plaintiff had abandoned her claim for benefits based upon her physical disabilities in light of statements about pain in her back and neck she had given to various sources.  (R. at 29.)  According to the ALJ,

"[t]he inconsistency between these representations and the claimant's desire to 'abandon' her theory of disability (to the extent it relates to a physical impairment)" suggested she "has been disingenuous with respect to the duration and severity of her physical impairment.  This implication simply reinforces the finding that the claimant's testimony and subjective complaints cannot be relied upon in reaching a conclusion in this case."  (*Id.*)  The ALJ also again noted her rejection of Dr. Macklin's somatoform diagnosis because his testimony was "primarily based upon the analysis of an invalid IQ test, as well as the subjective complaints of the claimant."  (R. at 30.)  In sum, the ALJ found that the evidence supported a "comprehensive rejection of all representations and subjective complaints expressed by the claimant regarding the severity of her mental impairments."  (R. at 31.)

At Step 4, the ALJ found that Plaintiff could not perform her past relevant work.  (*Id.*)  At Step 5, the ALJ found that Plaintiff could perform other jobs that exist in the national economy.  (R. at 31-32.)[15]  Therefore, the ALJ found that Plaintiff was not disabled through her date last insured, December 31, 2011.  (R. at 32-33.)

### D.  STANDARD OF REVIEW

---

[15] The ALJ referenced and adopted the VE's pre-remand testimony about jobs Plaintiff could perform.

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").  Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability."  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### E.  ANALYSIS

Plaintiff raises two issues. First, she contends the ALJ failed to comply with the Appeals Council's remand order. (DE 17 at 18-21.) Second, she contends the

ALJ's finding that she did not have somatoform disorder is based upon an erroneous statement (i.e., is not supported by substantial evidence). (*Id.* at 21-25.) The Commissioner opposes Plaintiff's motion, asserting that she is entitled to summary judgment because substantial evidence supports the ALJ's conclusions. I agree with Plaintiff.[16]

### 1.   Failure to Comply With the Appeals Council's Order

Among other things, the Appeals Council ordered the ALJ on remand to:

Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). **In so doing, evaluate treating and non-treating source opinions pursuant to the provisions of 20 CFR 404.1527 and Social Security Rulings 96-2p and 96-5p and non-source examining opinions in accordance with the provisions of 20 CFR 404.1527(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence**.

(R. at 161) (emphasis added).

---

[16] Plaintiff's brief does not contain an "Issues Presented" page. My Practice Guidelines provide in relevant part that "[a]ll motions and briefs must comply with Local Rule 7.1. The parties are particularly reminded of the requirement that all briefs must include an 'Issues Presented' page. On that page, the parties shall outline the issues to be presented in their briefing." Similarly, Local Rule 7.1(d)(2) provides in relevant part that "[a] brief supporting a motion or response must, at the beginning, contain a concise statement of the issues presented and, on the following page, the controlling or most appropriate authority for the relief sought." In the interests of judicial economy and expediency, I will, with some reluctance, leniently address the issues on the merits despite the structural deficiencies of Plaintiff's brief. However, counsel is cautioned to comply with all judicial officers' Practice Guidelines, as well as all Local Rules, in the future.

Plaintiff contends the ALJ's incorporation of portions of her prior opinion failed to comply with that directive because that incorporation "simply reinstated the very decision the Appeals Council *vacated* . . . ." (DE 17 at 19.)  Plaintiff also contends the ALJ failed to consider the opinions of all sources, as best exemplified by her "essentially ignor[ing]" the opinions of Dr. Schimmel and not discussing the opinions of Dr. Mohammed or Ms. Azmeh.  (DE 17 at 20-21.)

In response, the Commissioner asserts that the ALJ "expressly reevaluated the opinions provided by Drs. Boneff and Dibai, in accordance with the Appeals Council order.  No more was required."  (DE 19 at 13) (citation omitted).  As for the opinions of Dr. Mohammed and Ms. Azmeh, the Commissioner argues that Dr. Mohammed "did not provide an opinion about Plaintiff's functional limitations— he merely diagnosed mental conditions and assessed a GAF score" and "the Appeals Council did not suggest that there was any flaw in the ALJ's initial evaluation" of Ms. Azmeh's opinion.  (DE 19 at 17.)  Notably, the Commissioner does not refute Plaintiff's argument that Dr. Mohammed's opinions were not discussed by the ALJ.  Overall, the Commissioner asserts that the ALJ sufficiently complied with the Appeals Council's order.

### a.  Does the Court Have Jurisdiction?

Although surprisingly not discussed by the parties, the Court must first determine whether it has jurisdiction to provide relief for an ALJ's failure to

comply with an order of the Appeals Council. This question has not been uniformly answered by federal courts, nor has the Sixth Circuit addressed it.

"There is disagreement amongst Federal Courts as to whether an ALJ's failure to follow an Appeals Council directive may serve as an independent grounds for reversal absent other error." *Kearney v. Colvin*, 14 F.Supp.3d 943, 950 (S.D. Ohio 2014) (listing cases as follows "*Compare Miller v. Barnhart,* 175 Fed.Appx. 952, 956 (10th Cir.2006) (holding that because 'the Appeals Council found [ ] the ALJ complied with its [R]emand [O]rder ... [i]t is appropriate to examine the Commissioner's final decision under our usual standards, rather than focusing on conformance with particular terms of the [R]emand [O]rder'); *Brown v. Comm'r of Soc. Sec.,* No. 1:08–cv–183, 2009 WL 465708, at *5 (W.D. Mich. Feb. 24, 2009) (finding plaintiff's appeal, based upon the Appeals Council's Remand Order, 'inappropriate, because it seeks to have [the] court review an internal agency matter'); *with Huddleston v. Astrue,* 826 F.Supp.2d 942, 954–55 (S.D. W.Va. 2011) (citing conflicting case law, but ultimately holding that 'an ALJ's failure to follow the directives of [a] [R]emand [O]rder issued by the Appeals Council constitutes legal error' that may necessitate remand); *Salvati v. Astrue,* 2010 WL 546490 (E.D. Tenn. Feb. 10, 2010) (finding an ALJ's failure to follow the dictates of the Appeals Council's Remand Order is an error necessitating remand)."). Even district courts within this Circuit have reached differing

25

conclusions on this issue. *See Godbey v. Colvin*, 2014 WL 4437647, at *5 (W.D.

Ky. Sept. 9, 2014) ("The Court will begin by observing there is no consensus

among federal courts regarding whether an ALJ's failure to follow Appeals Council

directives in a remand order may serve as independent grounds for reversal absent

other error.  Differing opinions exist not only between circuits, but also among

courts within the Sixth Circuit[,] which has not considered this particular issue. For

example, at least two district courts within the Sixth Circuit have held they lacked

jurisdiction to review what they viewed as an internal agency matter that arose

prior to issuance of the Commissioner's final decision." *Cooper v. Colvin,* 2014

WL 2167651, *2 (W.D.Ky. May 23, 2014) (internal citations and quotations marks

omitted); *Brown v. Commissioner of Social Security,* 2009 WL 465708, *5

(W.D.Mich. Feb. 24, 2009). At least one district court within the Sixth Circuit has

held this is a procedural error that denied plaintiff fair process and, therefore, it

reversed the final decision of the Commissioner and, pursuant to sentence four of

42 U.S.C. § 405(g), remanded the case back to the Commissioner for further

proceedings. *Salvati v. Astrue,* 2010 WL 546490, *5–8 (E.D. Tenn. Feb. 10,

2010). At least three district courts within the Sixth Circuit have for the purposes

of the analysis, assumed, without deciding, that such an error may serve as an

independent ground for reversal, and the court thus has jurisdiction to consider the

issue. *Kearney v. Colvin,* 2014 WL 1091968, *7 [14 F.Supp.3d 943] (S.D. Ohio

March 18, 2014); *Schults v. Colvin,* 2014 WL 798399, \*3–4 [1 F.Supp.3d 712]

(E.D. Ky Feb. 27, 2014); *Long v. Commissioner of Social Security,* 2012 WL

4009597, \*2–3 (S.D. Ohio Sept. 12, 2012).”) (quotation marks and citations

omitted).

The Commissioner, however, did not raise a jurisdictional argument in

response to Plaintiff directly presenting the ALJ’s failure to comply with the

Appeals Council’s order as grounds for relief.[17]   Moreover, the Commissioner’s

own regulations require an ALJ to “take any action that is ordered by the Appeals

Council . . . .”  20 C.F.R. §404.977(b).  As the Court cogently held in *Godbey*,

“[t]his means administrative law judge compliance with a remand order is a

mandatory procedural requirement under the Commissioner's own regulations.

Thus, when an administrative law judge fails to comply with an emphatic directive

---

[17] By contrast, at least once before the Commissioner did assert that federal courts lack the jurisdiction to review whether an ALJ complied with a remand order of the Appeals Council.  *See, e.g., Llaneza v. Comm'r of Soc. Sec.*, 2016 WL 4054918, at \*12 (S.D. Ohio July 12, 2016) (“Plaintiff next argues that ALJ erred in failing ‘to comply with the mandate of the Appeals Council, which on remand ordered that the ALJ obtain evidence from a medical expert, preferably a psychiatrist or psychologist, to clarify the nature, severity and limiting effects of the claimant's impairments.’ The Commissioner contends that this failure does not warrant remand because ‘the Court does not have jurisdiction to consider whether [the ALJ] complied with the Appeal Council's instructions on remand.’”) (citations omitted).  In reliance upon that argument by the Commissioner, and after citing some cases highlighting the ongoing split of authority on the question, the *Llaneza* court determined that it “lacks jurisdiction to consider whether the ALJ properly complied with the Appeals Council's instructions on remand.”  *Id.*

. . . within a remand order, the administrative law judge's decision does not comport with applicable procedural law." *Godbey*, 2014 WL 4437647, at *7 (citations omitted).

The Court should conclude that an ALJ's failure to comply with an order of the Appeals Council violates a claimant's right to receive fair process as embodied in the Commissioner's own administrative regulations. Thus, such a failure by the ALJ can constitute a reversible error in federal court--even if substantial evidence otherwise supports the Commissioner's final decision. *See Salvati*, 2010 WL 546490150, at *6-7.[18]

_____

[18] Specifically, *Salvati* held in relevant part:

Like the reason-giving requirement of 20 C.F.R. § 404.1527(d)(2), the procedural requirement that an ALJ must follow the specific instructions given to him in a remand order from the Appeals Council exists to ensure that each claimant receives fair process. Therefore, an ALJ's failure to follow the dictates of a remand order is an error that necessitates remand when it makes meaningful judicial review of the ALJ's decision is [sic] impossible. Whether the Court agrees with the Commissioner that substantial evidence supported the ALJ's ultimate determination of Plaintiff's mental RFC is irrelevant. Substantial evidence alone does not excuse non-compliance with the Appeals Council's remand order.

It is not the Court's place to reweigh the evidence contained in the record to make a determination about Plaintiff's mental RFC . . . . The Court reiterates that the fact that the record may possess substantial evidence to support the ALJ's ultimate determination of Plaintiff's mental RFC is inapposite because the ALJ's procedural error denied Plaintiff fair process. . . . The Court of Appeals published *Blakley* as a "modest reminder that the Commissioner must follow his

### b.   Incorporation By Reference Is Not Inherently Erroneous, But It Was Improper in This Case

Plaintiff argues that the ALJ's incorporation by reference of a vacated opinion was, in and of itself, an inherently reversible error.  However, Plaintiff cites to no binding authority to support that far-reaching proposition and the Court is skeptical that there is inherent, reversible error each time an ALJ incorporates by reference portions of a vacated decision on remand.

The Court does agree with Plaintiff, however, that the ALJ erred in this particular case by concluding that she did not have to discuss most evidence adduced prior to the first hearing because there were no disputes about it.  Near the beginning of the second hearing, the ALJ asked Plaintiff's counsel "[o]kay, and any objections to the exhibits that are in the file?"  (R. at 42.)  Plaintiff's counsel simply answered "[n]o."  (R. at 42.)  In her opinion on remand, the ALJ used that short, routine exchange designed to delineate what items were in the record to make a finding that she could incorporate by reference, unless otherwise noted, "the analysis of all evidence contained in the March 22, 2011 decision . . . ."  (R. at 26.)

---

own procedural regulations." 581 F.3d 399, 2009 WL 3029653 at *
10. In the same spirit, this Court now reminds the Commissioner that
an ALJ cannot disregard the express instructions contained in a
remand order from the Appeals Council. 20 C.F.R. § 404.977(b).

2010 WL 546490, at *6-7 (quotation marks and citations omitted).

Counsel's mere agreement as to what evidence was in the record does not connote agreement with how that evidence should be examined and utilized. To the contrary, Plaintiff obviously disagreed with how the ALJ examined that evidence in her first opinion because she successfully sought review of that decision by the Appeals Council.  In addition, the Appeals Council vacated the first opinion and specifically ordered an examination afresh of the evidence from all medical sources, including a re-examination of Plaintiff's RFC.  The ALJ thus erred by incorporating by reference, and without fresh discussion, her prior opinion's analysis.

### c.   The ALJ Did Not Address All Source Opinions

Turning to the heart of Plaintiff's argument, and despite the Commissioner's *post hoc* rationalizations, I agree with Plaintiff's basic assertion—the ALJ did not on remand evaluate/re-evaluate the treating, non-treating and examining source opinions as directed by the Appeals Council.  *See Keeton v. Comm'r of Soc. Sec.*, 583 Fed.App'x. 515, 524 (6th Cir. 2014) ("In reviewing an ALJ's findings and conclusions, this Court shall not accept appellate counsel's *post hoc* rationalization for agency action in lieu of [accurate] reasons and findings enunciated by the Board.") (quotation marks and citation omitted).

The Appeals Council specifically required the ALJ to evaluate treating, non-treating and examining source opinions, and to explain what weight was given to

30

each source's opinion.  However, the ALJ's second opinion did not mention Dr.

Mohammed or Ms. Azmeh,[19] and there is certainly no explanation of what weight

each of their opinions was given, if any.[20]  Moreover, the ALJ expressly found the

IQ testing by Dr. Schimmel to be invalid but did not explicitly state what weight, if

any, she gave to his overall opinions.  (R. at 28.)  It can perhaps be inferred that the

ALJ gave little to no weight to Dr. Schimmel's opinions, but the Appeals Council

directed the ALJ to "explain the weight given" to each source's opinion.

---

[19] In her initial opinion, the ALJ did not name Dr. Mohammed but she noted that Plaintiff had been diagnosed with bipolar disorder and panic disorder, citing Exhibit 13F, which contains Dr. Mohammed's evaluation.  (R. at 150, 613-642.) The ALJ again cited Exhibit 13F for the statement that Plaintiff's treatment notes "indicate some progress."  (R. at 150.)  There are no further references to Dr. Mohammed.  Therefore, even if it were proper for the ALJ to incorporate her prior opinion by reference, there is insufficient evidence in that initial opinion for a subsequent reviewer to ascertain the weight, if any, given to Dr. Mohammed's opinions.

[20] The Commissioner refers to Dr. Mohammed in her motion for summary judgment as Plaintiff's "treating psychiatrist . . . ."  (DE 19 at 17.)  When assessing the opinion of a treating source, an ALJ must "give good reasons in [the] notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. §404.1527(c)(2).  Assuming, *arguendo*, Dr. Mohammed qualifies to be a treating source, the ALJ's failure to discuss and evaluate his opinions is thus an even more egregious mistake.  In addition, the ALJ was obligated to consider Dr. Mohammed's opinions under applicable Social Security regulations.  *See* 20 C.F.R. §404. 1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").

Frankly, it is curious that the Appeals Council declined to take action in response to Plaintiff's second request for review.[21]   Nonetheless, the violation of the Appeals Council's order of remand is apparent, and even if there were *no remand order* from the Appeals Council to guide us, the above-described deficiencies would constitute reversible error upon the Court's independent review of the ALJ's opinion(s) at issue.

The Commissioner attempts to excuse the ALJ's failure to discuss Dr. Mohammed by noting, correctly, that he did not assess what functional limitations he believed Plaintiff has from her mental impairments.  The Commissioner, however, does not cite authority to buttress her contention that the ALJ could ignore Dr. Mohammed's opinion entirely because it does not contain a functional limitation analysis.[22]   Indeed, Dr. Mohammed listed the impairments he believed Plaintiff to have and assigned her a GAF score.  Thus, his assessment, though

---

[21] The Court notes that the initial order of remand was signed by Administrative Appeals Judges Christopher Hargis and Mark Milett (R. at 161) but the second order of the Appeals Council declining to take action was signed by only Administrative Appeals Judge A. Van Soest.  (R. at 3.)

[22] The terse extent of the Commissioner's argument on this point is:
> Plaintiff also contends that the ALJ should have reevaluated the opinions provided by her treating psychiatrist, Dr. Mohammed, and her therapist, Ms. Azmeh. Pl. Brief at 20-21, Tr. 533-35, 663-64. As an initial matter, Dr. Mohammed did not provide an opinion about Plaintiff's functional limitations—he merely diagnosed mental conditions and assessed a GAF score. Tr. 533-35.

(DE 19 at 17.)

imperfect, is not devoid of information about his beliefs regarding the nature and severity of Plaintiff's impairments.[23]

Perhaps the omission of a functional limitation analysis from Dr. Mohammed's opinions could lead to his opinion being given less weight, but it does not excuse ignoring his opinions altogether.  The ALJ's inexplicable failure to state what weight, if any, she assigned Dr. Mohammed's opinions—despite the Commissioner's belief that he is a treating psychiatrist-- prevents meaningful review in this Court.  *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 837 n.8 (6th Cir. 2016) ("While we may look to any evidence in the record to determine whether the ALJ's decision was supported by substantial evidence, we cannot engage in a meaningful review of the ALJ's decision to support her findings with an opinion to which she has not assigned any weight-aside from giving limited weight to the separate GAF portion of the opinion.") (citation omitted); *Cox v. Comm'r of Soc. Sec.*, 615 Fed. App'x 254, 258 (6th Cir. 2015) ("In sum, the ALJ's decision does not make clear how she classified the medical sources, what weight she assigned to the opinions of treating sources, or why she assigned them that weight. We do not consider this ambiguity harmless error, even though substantial evidence may

---

[23] The Appeals Council explicitly authorized "[a]s appropriate," the ALJ to "request the treating and non-treating sources to provide additional evidence and/or further clarification of the opinions and medical source statement about what the claimant could still do despite the impairments . . . ."  (R. at 161.)  If the ALJ believed Dr. Mohammed's opinions to be incomplete or in need of clarification, the ALJ could have requested supplemental information from him.

support the ALJ's evaluation of the medical source opinions, because we cannot meaningfully review the ALJ's actual reasoning. We therefore remand to the Commissioner for reevaluation of the medical source opinions.") (citation omitted).  Consequently, the Court should remand this matter with instructions to discuss the opinions of all sources, with an explanation of the weight given to each source's opinion.

### 2.   Somatoform Disorder

If the Court agrees that remand is appropriate due to the ALJ's failure to address all source opinions, it may be unnecessary to determine whether the ALJ's conclusions about somatoform disorder are proper since the ALJ will be required to issue an entirely new opinion on remand.  However, to complete the record and in the event that the Court ultimately finds Plaintiff's first argument to be without merit, this Report and Recommendation will briefly address Plaintiff's somatoform argument.

Notably, as the Court construes it, Plaintiff does not argue that she meets Listing 12.07; instead she argues the ALJ's conclusion that she does not have somatoform disorder is based upon an incorrect reading of the record (i.e., is not supported by substantial evidence).  Specifically, the ALJ rejected Dr. Macklin's somatoform diagnosis, at least in part, because "during the course of approximately 5 years of mental health treatment, no other medical professional have [sic]

prepared any treatment notes that support Dr. Macklin's diagnosis." (R. at 24.) Plaintiff asserts "the medical record contains numerous instances of the very findings the ALJ mistakenly believed were absent." (DE 17 at 22.) I agree.

Plaintiff relies upon Dr. Dibai's statement that Plaintiff "appeared preoccupied with somatic complaints and particularly back pain . . . ." (R. at 666.) In addition, Plaintiff notes that Dr. Schimmel opined that Plaintiff's test results mean that "[d]epressive and hysterical features are likely."[24] (R. at 544.) Plaintiff also cites Dr. Mohammed's notation that Plaintiff "reports the following somatic complaints: Difficulty with sleep, difficulty with appetite, abdominal pain, tachycardia, shortness of breath, sweating, headache, dizziness, crying spells, decreased energy, loss of interest." (R. at 535.) In addition, Plaintiff mentions Dr. Boneff's diagnosis that Plaintiff suffers from "[m]ixed personality disorder with *histrionic*, borderline, narcissistic, and dependent features" and his statement that Plaintiff "appeared to exaggerate her difficulties throughout the evaluation, presenting in an immature fashion and acting in a *histrionic manner*." (R. at 670, 673) (emphasis added). Finally, Plaintiff notes that Dr. Boneff rejected the results of Plaintiff's MMPI (Minnesota Multiphasic Personality Inventory) test because of the "excessive endorsement of unusual and 'Pathological' items" and an "essential

---

[24] Plaintiff contends that Dr. Macklin testified that the former term for somatic disorder was "hysterical." (DE 17 at 23.) However, Dr. Macklin actually testified that somatoform disorder was formerly referred to as "histrionic"—not hysterical. (R. at 76.)

elevation on all of the clinical scales . . . ," (R. at 673), but Dr. Macklin testified that Plaintiff's excessive endorsement was characteristic of someone with somatoform disorder.[25]

Based on those comments, Plaintiff asserts that "there was significant evidence supportive of Dr. Macklin's opinions. The ALJ's conclusion, based upon the belief that there was *none*, is therefore unsupported by substantial evidence and subject to reversal by this Court. 42 USC §405(g). Whether the ALJ ultimate[ly] adopts these opinions or other evidence, she is at the very least obliged to consider it all before deciding plaintiff's claim."  (DE 17 at 23-24.)

The ALJ was correct when she found that no source besides Dr. Macklin found Plaintiff has somatoform disorder.  However, as the ALJ also noted, that fact

---

[25] Specifically, Dr. Macklin testified in relevant part as follows:
> The MMPI that was done in the consultative exam . . . by the psychologist, he on page 6 said that it was invalid because all the scales were elevated.  Well, all the scales are elevated in people who are hypochondriacal, so he—I'm not sure why he missed that.  He basically said she endorsed everything, which that's kind of what hypochondriasis is, and so the MMPI, I'm disagreeing with the psychologist who interpreted it, is evidence for hypochondriasis or somatoform disorder.

(R. at 78-79.)  Hypochondriasis is defined as "morbid concern about one's health especially when accompanied by delusions of physical disease[.]" https://www.merriam-webster.com/dictionary/hypochondriasis#medicalDictionary (last visited December 14, 2016).  At least one online medical dictionary states that hypochondriasis "is classified as a somatoform disorder."  http://medical-dictionary.thefreedictionary.com/hypochondriasis (last visited December 14, 2016).

"is certainly not determinative as to the existence or medical equivalency of that impairment."  (R. at 24.)  The ALJ went on to state that "no other medical professional have [sic] prepared any treatment notes that support Dr. Macklin's diagnosis."  (R. at 24.)  However, as the previously quoted citations from other sources show, other medical professionals have made comments which could be interpreted to support Dr. Macklin's diagnosis.  The ALJ's statement that there was *nothing* in the record to support Dr. Macklin's conclusion thus is erroneous. [26]

To be sure, there is also evidence which could lead to a conclusion that Plaintiff does not have somatoform disorder/meet Listing 12.07.  For example, Dr. Pinaire failed to check boxes on his evaluation corresponding to somatoform disorder.  (R. at 581.)  The references in Dr. Mohammed's notes to Plaintiff's obsession with somatic complaints could be construed as merely her being preoccupied with her physical ailments, as the Commissioner argues. [27]

However, the ALJ did not reach a proper conclusion based upon a consideration of the conflicting evidence.  Any conclusion about whether Plaintiff

---

[26] In a different section of her opinion, the ALJ mentioned in passing Dr. Boneff's observation that Plaintiff behaved in a histrionic manner and his diagnosis of her having histrionic features (R. at 27), but the ALJ did not connect those observations to whether Plaintiff has somatoform disorder.

[27] Among the definitions of somatic is "of, relating to, or affecting the body especially as distinguished from the germplasm or psyche [.]" https://www.merriam-webster.com/dictionary/somatic#medicalDictionary (last visited December 14, 2016).

has somatoform disorder must be based upon a proper analysis of the record,

which includes evidence counseling for and against such a finding.  In other words,

the ALJ's mistaken statement about the record containing *nothing* to support Dr.

Macklin's diagnosis is not a harmless error.  *Keeton*, 583 Fed. App'x. at 524 ("This

Court has adopted the First Circuit's pronouncement on this issue: Where a

subsidiary finding is unfounded, the court will remand the case to the agency for

further consideration ... if the court is in substantial doubt whether the

administrative agency would have made the same ultimate finding with the

erroneous finding removed from the picture[.]") (quotation marks and citations

omitted).[28]

---

[28] The ALJ relied heavily in her decision upon the fact that the Plaintiff was able to successfully obtain a number of college credit hours.  *See* R. at 31 ("The remaining evidence demonstrates that, despite the limitations imposed by her mental impairments, from 2003 to 2012, the claimant was able to retain the mental capacity to commute to a college campus, sit in classes with other students, and maintain adequate attention and concentration . . . .").  However, as Plaintiff notes in her motion for summary judgment, having the ability to attend college classes for an hour or so at a time is not the same as having the ability to engage in a typical 40-hour workweek (i.e., engage in substantial gainful activity).  *See, e.g.,* Social Security Ruling 96-8p, 1996 WL 374184, at *1 (July 2, 1996) ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").  That distinction between attending school and working full-time was pointedly made by Dr. Macklin at the second hearing (R. at 84), but the ALJ's decision fails to address it.  Though the issue of Plaintiff's credibility is for the ALJ to determine, upon remand the ALJ should discuss how Plaintiff's ability to attend college classes does/does not, correlate to her having the ability to complete a typical workweek.

### 3.   Remand Under Sentence Four

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.,* 17 F.3d 171, 174 (6th Cir.1994) (citing 42 U.S.C. § 405(g)).  Under a sentence-four remand, the Court has the authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a hearing."  42 U.S.C. § 405(g).  Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue,* 2011 WL 2292305, at *8 (E.D. Ky. June 8, 2011) (citing *Faucher,* 17 F.3d at 174); *see also White v. Comm'r of Soc. Sec.*, 312 Fed. App'x 779, 790 (6th Cir. 2009) ("If a court determines that substantial evidence does not support the [Commissioner's] decision, the court can reverse the decision and immediately award benefits only if all factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.") (quotation marks and citation omitted).  Here,

there is insufficient support for the ALJ's findings and there are unresolved factual issues. Accordingly, the Undersigned recommends that the Court remand this case under Sentence Four.

## F.   CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, the Undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for summary judgment (DE 17), **DENY** Defendant's motion for summary judgment (DE 19), **REVERSE** the Commissioner of Social Security's non-disability finding, and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation, including, but not necessarily limited to, a discussion of the opinion(s) of all sources and an explanation of the weight given, if any, to each source's opinion(s); assessing whether Plaintiff meets or equals Listing 12.07 based upon a review of all of the relevant portions of the record; and a specific explanation of how Plaintiff's ability to attend college does/does not correlate to her having the ability to engage in substantial gainful activity during the relevant time period.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: December 29, 2016          s/Anthony P. Patti
                                  Anthony P. Patti
                                  UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on December 29, 2016, electronically and/or by U.S. Mail.

                                  s/Michael Williams
                                  Case Manager for the
                                  Honorable Anthony P. Patti